[No. 11461. Department Two. February 16, 1914.]

GEORGE WINSTON et al., *Respondents*, v. FRANK TERRACE, *Appellant*.[1]

APPEAL—REVIEW—PLEADINGS—AMENDMENTS. In an action for assault, error cannot be assigned in allowing evidence of consequent ill-health as the result of the assault, without having been pleaded, where there was no claim of surprise; since the supreme court will consider the complaint as amended.

APPEAL—HARMLESS ERROR—EVIDENCE. The general rule is that error in the admission of evidence is cured by its withdrawal.

ASSAULT AND BATTERY—ACTION FOR DAMAGES—DEFENSES — GENERAL REPUTATION. In an action for an unprovoked assault, which was admitted by defendant, evidence as to his general reputation is properly excluded.

APPEAL—REVIEW—HARMLESS ERROR—EVIDENCE. Overruling an improper question on cross-examination is harmless error, where nothing material or prejudicial was elicited by the answer.

SAME—IMPEACHMENT OF WITNESS. The impeachment of a witness upon immaterial statements that she had made to others cannot be assigned as error, where appellant had opened the door to that line of proof.

ASSAULT AND BATTERY—DAMAGES—MENTAL ANGUISH. In an action for an assault by driving the plaintiff, a woman sixty years of age, out of her home, at the point of a pistol, the plaintiff may recover for mental anguish and injury to her health, where she fainted through fright and became nervous and sick and unable to remain in the neighborhood for two months.

TRIAL—INSTRUCTIONS — COMMENT ON FACTS — ASSAULT AND BATTERY. In an action for an assault, by pointing a pistol at the plaintiff, an instruction defining ·what constitutes an assault in such cases is not an unlawful comment on the evidence, where the judge was speaking abstractly in the illustration of an assault given, and not to the facts of the particular case, and the jury must have so understood it.

TRIAL—MISCONDUCT OF COUNSEL—ISSUES. In an action for an assault, error cannot be assigned in that the plaintiff's counsel referred to the defendant as a "millionaire" and as being a very rich man, where the defendant had pleaded affirmatively a conspiracy to provoke an assault and that he was known to be worth a

[1]Reported in 138 Pac. 673.

considerable sum of money, and gave evidence in support of his claim of a conspiracy to obtain some part of his property.

ASSAULT AND BATTERY—EXCESSIVE DAMAGES. A verdict for two thousand dollars damages for an assault is not excessive, where it appears that defendant made an unprovoked assault upon the plaintiff by driving her out of her house at the point of a pistol, and as a result of fright, she fainted away and became nervous and sick and was unable to do her house work and had to be removed from the neighborhood for a period of two months.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered February 24, 1913, upon the verdict of a jury rendered in favor of the plaintiffs, in an action in tort. Affirmed.

*Frank S. Griffith* and *Piles & Howe*, for appellant.

*E. W. Howell* and *Jay C. Allen*, for respondents.

FULLERTON, J.—The respondents, husband and wife, brought this action against the appellant to recover damages for trespass and assault. Three separate causes of action were set forth in the complaint; the first, for a wrongful and unlawful trespass upon the property of the respondents; the second for an unlawful assault upon the husband; and the third, for an unlawful assault upon the wife. The answer was, in substance, a general denial of the allegations of the complaint, and an affirmative plea to the effect that the respondents conspired together to induce the appellant to commit a wrong that they might thereby have a possible cause of action against him; they well knowing that he was "worth considerable sum of money and to have considerable property, and able to respond to a judgment should one be obtained against him." On the trial, at the conclusion of the evidence, the court instructed the jury that no more than nominal damages could be recovered on the first and second causes of action, and no more on the third cause of action than was demanded in that cause as the measure of the particular wrong therein set forth. The jury returned a verdict awarding the respondents one dollar each on the first two causes

of action, and the sum of two thousand dollars on the third. Judgment was entered accordingly, and this appeal is prosecuted therefrom.

Since the jury found in favor of the respondents, we must, of course, assume as true that version of the conflicting evidence which tends most strongly to support their verdict. It appears that the appellant, for a number of years prior to the time the wrongs were committed which are complained of in the complaint, resided with this wife on a farm situated in the White River valley, in King county. The couple had no children of their own, but had living with them two nieces of the appellant, the one at the time named being twenty-four years of age and the other eighteen. These nieces were the daughters of the appellant's deceased sister, which he had brought to his home from the state of Texas, where the sister resided at the time of her death, and where the father and a brother of the girls still reside. The appellant's native place is the Isle of Guernsey, from which he migrated to the state of Texas, taking his sister with him. The sister there married against the appellant's wishes, which so infuriated him that he, to use his own expression, "disowned her" and thereafter never communicated with her.

The respondents, for more than twenty years, lived neighbors to the appellant and his family. They had a large family of sons and daughters, all of whom, as the record abundantly shows, were eminently respectable people. A strong friendship existed between the families, and they constantly visited with one another, and performed for each other those neighborly kindlinesses usual in such cases. At one time the elder niece offered some offense to her aunt which the aunt seemed not readily to forgive; and on the appellant's advice, she went to the respondents' home and there remained until her aunt became reconciled to her.

As the girls grew into womanhood, they began to receive attention from possible suitors, to most of whom the appellant manifested his opposition, seemingly to most oppose

those whom the girls most favored. These matters created some friction and perhaps ill-feeling between the appellant and his nieces, particularly between the appellant and the elder niece. There lived in the neighborhood of the appellant and respondent a family by the name of Peterson, who were also long time friends of both families. In the early part of the year 1912, the mother of the family died, leaving a husband, and a son about the age of the elder niece. For some six months after the mother's death, the elder niece had gone periodically to the Peterson home for the purpose of putting the house in order. Young Peterson married at the end of that period, and brought his wife to the family home. The house was not then in very good condition for his new wife's reception, and Peterson came to the appellant's home at about half past seven o'clock in the morning and requested the elder niece to go over to the house and assist in putting it in order. She asked her uncle for permission to go. He made no answer to her request, and she took it for granted that he had no objection and went along with Peterson. On the evening before this particular morning, the appellant had requested the girl to write some letters for him and these she had only partly completed, leaving with Peterson before she had finally done so. After working awhile at the Peterson home, she went to the village store on some errand for the Peterson home, and while there met her uncle, who upbraided her for leaving the work he had assigned her unfinished. She went back to Peterson's, and while there told Mrs. Peterson of her uncle's displeasure because she had not finished the letters, and immediately went back to her home, and took up her usual daily tasks. Afterwards the appellant returned home, seemingly in his usual humor, and matters went on through the day as was their wont.

On the next morning, the appellant went to the village after his paper, and while there met young Peterson who took him to task for upbraiding his niece. A quarrel ensued between them in which Peterson used toward the appellant some

very opprobrious language. The appellant returned home in a rage, which he vented upon his nieces; going so far as to get and tear up a paper which he said was a will he had made in their favor, saying that they would have to "get out" and go back to Texas to their father and brother; that he would pay their fare to their father's home and place to the credit of each of them in a bank there a hundred dollars. For the remainder of the morning, he refused to speak to them, and at the noon meal refused to eat at the table with them. Later on, while the appellant was taking his usual midday nap, the girls took counsel of their aunt as to what they should best do, and were advised to go to the respondents' home and there stay until their uncle should become reconciled to them. The girls thereupon went to the respondents' home, and told them of their uncle's conduct, and of the advice their aunt had given them. They were taken in by the respondents, and advised by both of the respondents to say nothing of their trouble with their uncle to the neighbors, as he would become reconciled to them in time and take them back to his home. The girls came to the respondents' home in the latter part of July, 1912, and the appellant made no inquiry of the respondents concerning them for nearly a month later. He states in his testimony that he did not know of their whereabouts. But he admitted, on cross-examination, that he had passed the younger girl in the company of one of the respondents' daughters, whom he knew, on the road some two weeks after the girls had left his home (passing her without speaking to her), and it was abundantly shown that they both attended the village church each Sunday during that time in company with the respondents. It was shown, furthermore, that the elder girl had been taught the trade of a milliner, and that she had been employed in that capacity during that time by various of the neighbors surrounding the appellant's home.

On August 27, 1912, while going to the village store, the appellant saw the younger girl gathering plums in the

Peterson yard. He did not speak to her, but, on returning home, went by the respondents' home, and meeting Mrs. Winston, told what he had seen; telling her further that she knew he did not want the girls to go to Petersons, and that he would hold her responsible for the girls. On the next day, he came again to the respondents' home, where he met both of the respondents, and again took up the subject of the girls' conduct. In his talk while there, he again said that the girls must go to Texas to their father and brother; repeating substantially the statements, concerning their fare and the money he would deposit for them, he had made to the girls before they left his home; further saying that they would go to Texas as he demanded or there would be bloodshed, and that he would return the next day for an answer.

After the appellant had left the place, the respondents informed the girls of their uncle's desires, and inquired whether or not they would comply with his wishes, which both of them declined to do. On the next morning, the elder girl, not wishing to meet her uncle, left the respondents' home early. The appellant came shortly thereafter, and was met by Mr. Winston at the door, to whom he stated that he had come for his answer. Mr. Winston informed him that the girls did not desire to go to Texas. He then asked where the girls were, and was told that the younger girl was in the house and that the elder one had gone away. The appellant thereupon pushed aside a screen door and started to enter the house, Winston stepped in front of him, telling him his place was outside. The appellant thereupon drew a revolver from his pocket, pointed it at Winston's face, and said: "If any —— man interferes with me, I will blow his brains out." He then brushed aside Mr. Winston, and with his revolver still in his hands, rushed upstairs to a bedroom in which he found the younger girl with one of Winston's daughters. He pointed his revolver at them and told them to get out immediately. On the way out, he met Mrs. Winston, who was standing in the door of another bedroom, and pointing his

revolver at her, told her also to leave the house. The women left in great fright, going to the village, which was some quarter of a mile away, where Mrs. Winston fainted from exhaustion and fright. The appellant not finding the elder girl, thereupon left the house.

Mrs. Winston was, at this time, some sixty years of age, and had theretofore enjoyed good health. As a result of the appellant's acts, she became nervous, easily frightened, disabled from carrying on her household duties, and lived in constant fear of the appellant; so much so that the family were compelled to remove her from her home to another neighborhood, out of the way of the appellant, where she remained for some two months before recovering her normal self.

The first contention made by the appellant in this court is that the trial court erred in permitting respondents to show, over his objection, the effect of the assault on the health of Mrs. Winston. The complaint contained no allegation to that effect, the bare naked assault only being alleged. The trial court took the view that mental anguish and consequent ill-health was the direct and natural result of the assault, and need not be specially pleaded in order to permit a recovery therefor, and on this ground permitted the evidence to be submitted to the jury. But whether the court correctly interpreted the pleadings in this respect is not a very material inquiry, as the case is presented to us. The appellant made no claim of surprise or unpreparedness to meet the proofs at the time the same were offered, and on their own branch of the case offered evidence tending to combat such proofs. Indeed, in his argument on another branch of the case, the appellant contends that it was "clearly established by the proofs" that the claim of Mrs. Winston in this behalf "is feigned;" that it is clearly shown that she suffered no ill effects whatever from the assault, and that this court ought so to find, notwithstanding the verdict of the jury to the contrary. If, therefore, the complaint was defective in the respect claimed, we are unable to find that it

in any way prejudiced the appellant's case. The objection as it is now presented is, therefore, technical; the defect in the complaint is one capable of being cured by amendment; and we are enjoined by statute to hear and determine all causes removed to this court "upon the merits thereof, disregarding all technicalities," and to "consider all amendments which could have been made as made." Rem. & Bal. Code, § 1752 (P. C. 81 § 1255). Such, moreover, has been our practice.

"The statute directs us to disregard any error or defect which does not affect a substantial right of the adverse party (§ 4957), and to determine all causes upon the merits thereof, disregarding all technicalities, and to consider all amendments which could have been made as made (§ 6535). When, therefore, a cause has been tried upon its merits, as if upon pleading sufficient in form and substance, in which the complaining party has not been misled, and has had full opportunity to present his case, some substantial wrong, some failure on the part of his adversary to aver or prove a material matter necessary on his part to be averred and proven in order to entitle him to recover, must be shown, before this court is warranted in reversing and remanding a cause for a new trial. A mere defect in pleading is not such a cause. It must not only be defective, but must have operated to the substantial injury of the complainant, before that result can follow. No such injury is shown by this branch of the·appellants' case." *Green v. Tidball,* 26 Wash. 338, 67 Pac. 84, 55 L. R. A. 879.

See, also, *Richardson v. Moore,* 30 Wash. 406, 71 Pac. 18; *Irby v. Phillips,* 40 Wash. 618, 82 Pac. 931; *Hester v. Stine,* 46 Wash. 469, 90 Pac. 594; *Donovan v. Olsen,* 47 Wash. 441, 92 Pac. 276; *Peterson v. Barry,* 50 Wash. 361, 97 Pac. 239; *Richardson v. Brotherhood of Locomotive Firemen & Enginemen,* 70 Wash. 76, 126 Pac. 82, 41 L. R. A. (N. S.) 320; *Gaskill v. Northern Assurance Co.,* 73 Wash. 668, 132 Pac. 643.

The court permitted the respondents, on their case in chief, to introduce evidence tending to show the temperament of the

appellant.  When presenting his own case, the appellant offered evidence to the effect that he was a peaceable and law abiding citizen.  Objection was made to this on the ground that he had admitted making the assault substantially as alleged, and hence his general reputation as a peaceable and law abiding citizen tended to dispute no issue in the case.  In the argument on this motion, the trial court reached the conclusion that the evidence as to the appellant's temperament was inadmissible, and withdrew all of the evidence upon the subject from the jury.  The appellant contends that the court in its ruling committed prejudicial error.  We think otherwise.  Conceding the evidence withdrawn to have been erroneously admitted, any error thus committed was cured by its withdrawal.  We are aware that this and other courts have held that, in certain cases, where the evidence introduced was highly prejudicial in its nature, error in its admission is not cured by its withdrawal from the jury.  But these are extreme cases, and the general rule is the other way.  In all ordinary cases, an error committed by the admission of incompetent and irrelevant evidence is cured by its withdrawal.  After the withdrawal of the evidence relating to the appellant's temperament, there was no error in excluding evidence as to his general reputation.

The elder niece of the appellant testified at the trial on his behalf.  She contradicted much that had been testified to by the respondents concerning the matters occurring at the respondents' home at the different times the appellant appeared thereat; testifying to her presence there and the causes which induced her to go there.  On cross-examination, she was asked if that was not the second time she had gone over to the Winstons because of trouble at home, to which she answered, "Yes, sir."  She was then asked, "What caused you to go there the first time?"  To this, an objection was interposed on the ground that it was not proper cross-examination.  This objection the court overruled, whereupon the witness answered, "It wasn't through Uncle Frank;" meaning the appellant.

Clearly there was here no reversible error. Conceding that the questions were improper on cross-examination, nothing was elicited from the witness which could be said to be material to the respondents, or prejudicial to the appellant. Error without prejudice is not a sufficient ground for reversal.

In the direct examination of this same witness, she was asked concerning the treatment accorded her and her sister by the appellant, and answered to the effect that such treatment had been uniformly kind and consistent. On cross-examination, it was sought to be shown that she had made statements to her friends and acquaintances not in accord with her testimony, and on her denial of the fact, witnesses were produced who testified to such statements. It is contended that this was impeaching the witness upon an immaterial matter, and hence error. We do not think so. The matter may not have been very material, but the appellant himself opened the doors to this line of proof, and he cannot now be heard to complain because the respondents pursued it.

The court instructed the jury that, in making up the verdict on the third cause of action, they might consider the mental anguish, if any, suffered by the respondent Mrs. Winston, the fear, the injury to her health, both past and present and future, if they found she was likely to suffer in the future. It is objected to this that it is neither within the issues, nor justified by the proofs. The first part of the objection we have sufficiently answered in our discussion of the first error suggested. As to the second part of the objection, we are clear that there was sufficient evidence to go to the jury on the question. This evidence we shall not detail here. We have stated its substance in our statement of the facts which we deemed the evidence tended to prove.

The court gave this further instruction to the jury, namely:

"An assault is an attempt to inflict bodily injury upon another with unlawful force, accompanied with the ability to

give effect to the attempt if not prevented. Such would be the raising of the hand in anger with the apparent purpose to strike and sufficiently near to enable the purpose to be carried into effect. The pointing of a loaded pistol at one who is within its range, the pointing of a pistol not loaded at one who is not aware of that fact and making an apparent attempt to shoot, and shaking a whip or a fist at a man's face in anger, riding or running after him in a threatening and hostile manner with a club or other weapon, and the like. The right that is invaded here indicates the nature of the wrong. Every person has a right to complete and perfect immunity from hostile assaults that threaten danger to the person; a right to live in a community without living in fear of personal harm."

It is complained of this that it in effect tells the jury that the appellant has committed a wrong, and is thus erroneous because a comment on the evidence. But it is manifest to our minds from a reading of the instruction that the judge was speaking abstractly; that is, he was defining the nature and meaning of an assault, and the part objected to related to the illustrations of an assault given, and not to the facts of the particular case. Nor do we think the jury could have understood the instruction otherwise, for elsewhere he instructed them fully as to their own duties, telling them that they were the sole and exclusive judges of the facts.

In his argument to the jury, one of the counsel for the respondents referred to the appellant as a "millionaire," and as being a rich man. This was excepted to by the appellant at the time, and he now claims that it exceeded the bounds of legitimate argument. But it will be remembered that the appellant in his answer had pleaded that he was known in the community where he lived, "to be worth a considerable sum of money and to have considerable property," and these facts were testified to on his behalf in support of his claim that the action of the respondents was the result of a conspiracy on the part of the respondents to obtain some part of his property. In the light of these circumstances, it can hardly be said to be beyond legitimate argument for counsel

to refer to the fact.   His statements were exaggerated, no doubt, but it was in line with the proofs, and it was for the jury to say how far it was justified by the evidence.   Moreover, the court had repeatedly cautioned the jury to make up their verdict on the facts from the testimony as given by the witnesses, and not from conclusions drawn therefrom by counsel, and he called attention to this caution when the objection was made by the appellant to counsel's statements.   We find no error in the proceeding.

Lastly, it is contended that the verdict is grossly excessive. Counsel say that they believe that "Mrs. Winston brought all this trouble upon herself intentionally;" but our view of the evidence will not permit us to draw this conclusion therefrom.   We cannot see wherein she has acted other than a neighborly and motherly part, or wherein she committed any act which would justify the highly reprehensible if not wanton assault made upon her person and her home by the appellant.   If her testimony and the testimony of her witnesses is to be believed—and, as we say, the jury were justified in believing it—she has suffered much because of the appellant's conduct, and we cannot conclude that the jury overestimated her damages.

The judgment is affirmed.

CROW, C. J., PARKER, and MOUNT, JJ., concur.