[No. 12021. Department One. December 28, 1914.]

F. W. MAXWELL et al., Respondents, v. A. R. DIMOND et al.,
Appellants.[1]

APPEAL—REVIEW—HARMLESS ERROR. It is harmless error to re-
fuse to require plaintiffs, in an action for conversion, to elect whether
they predicated their ownership on a sale, or upon ratification and
estoppel, where the trial proceeded upon the latter theory, and no
claim of surprise or motion for continuance was made, but the de-
fendants offered evidence to rebut the plaintiffs' theory.

LANDLORD AND TENANT—CROPPING LEASE—CONDITIONS—UNAUTHOR-
IZED TRANSFER—RATIFICATION—ESTOPPEL — EVIDENCE — SUFFICIENCY.
Lessors who had made a cropping lease for winter wheat providing
that the title to the crop should remain in them until receipt of their
share, and that the lessees should not assign the lease without their
consent or dispose of any part of the crop to the lessors' prejudice,
will be held to have ratified a public sale of their interests, made by
the lessees in February, and are estopped to dispute the title of the
purchasers at the sale, where there was evidence to the effect that
the purchasers worked on the crop in March, April and May in full
view of the lessors, living near by and working on adjoining land
and that the lessors, shortly after the sale when the prospects for a
crop were poor, were notified of the sale and made no objection or
claim until May 20th, after the prospects for a large crop were as-
sured.

SAME—OWNERSHIP OF CROP—ESTOPPEL—EVIDENCE—ADMISSIBILITY.
In an action for the conversion of wheat, purchased by plaintiffs
from a cropping tenant regardless of restrictive clauses in the lease,
evidence of plaintiffs' continued cultivation of the crop is admissible
on the question of their good faith, and also on an issue of the
estoppel of the defendant lessors after knowledge of such cultivation.

Appeal from a judgment of the superior court for Grant
county, Steiner, J., entered November 1, 1913, upon the
verdict of a jury rendered in favor of the plaintiffs, in an
action for conversion. Affirmed.

Daniel T. Cross and W. E. Southard, for appellants.

Boyd P. Doty and C. G. Jeffers, for respondents.

[1]Reported in 145 Pac. 77.

Gose, J.—This is an action for damages growing out of the alleged conversion of a crop of wheat. Verdict and judgment for plaintiffs. The defendants have appealed.

The facts are these: On the 28th day of February, 1911, the appellants entered into a written contract with one Meyers by which they leased to him certain land in Grant county. A portion of the land was leased for one year and the remainder for two years. The lease was duly filed for record in March following. The lease provides that the lessee shall not assign the lease or sublet the leased premises without the written consent of the lessors. It further provides that the title to all the products of the land shall be and remain in the lessors until they have received their rent, viz., one-third of the crop at the machine in sacks furnished by them, and that the lessee shall not dispose of any part of the crop to the prejudice of the lessors. The lessee fallowed one hundred and fifty acres of the leased land which fell within the two-year clause, in 1911, sowed it to wheat in September, and on the 24th day of February, 1912, caused his interest in the growing crop to be sold at public sale to the respondents, who paid at the rate of $2.95 per acre. The attempted sale was made without the knowledge or consent of the lessors.

The appeal presents three principal questions: (1) a question of pleading and practice; (2) the effect of the sale of a growing crop under the provisions of the lease; and (3) the sufficiency of the evidence to support the verdict.

At the close of the respondents' opening statement to the jury, the appellants' counsel moved the court to require the respondents to elect whether they would predicate title upon the purchase at public sale or whether they would rely upon title by estoppel. This motion was denied. The case was tried by the respondents upon the theory of ratification and estoppel. It is now contended that the complaint is insufficient in that it does not plead a title acquired in either of these ways. It is alleged in the complaint that respondents

were the owners and entitled to immediate possession and control of the wheat, describing the land upon which it grew, the quantity threshed, and value per bushel, and alleging further that, at a time stated, the appellants, then being in possession of the wheat, converted and disposed of it to their own use and benefit, to respondents' damage in the sum stated. In short, the complaint is in the usual form of a complaint in an action of conversion. It is earnestly contended that the respondents should have alleged the ultimate facts upon which they relied as constituting ratification and estoppel. This question we need not decide. The appellants were apprised of the course the case would take, at the commencement of the trial. They made no claim of surprise or unreadiness to meet the issues, and after the respondents had rested their case, they offered evidence tending to rebut the theory of ratification and estoppel. The statute requires us to disregard all errors which do not affect the substantial rights of the complaining party. Rem. & Bal. Code, § 307 (P. C. 81 § 303) ; *Winston v. Terrace,* 78 Wash. 146, 138 Pac. 673. Inasmuch as there was no claim of surprise and no application for a continuance and the case was tried upon the merits, the error, if any, is without prejudice.

It is next contended that, under the terms of the lease, the lessee had no authority to sell the crop without the consent of the appellants, which it is conceded was not given at the time of the sale. Inasmuch as the court so instructed the jury, this question need not be further considered.

The chief contention upon the merits is that the evidence does not support the verdict. It is admitted that, shortly after the pretended sale of the growing crop, Meyers left the leased premises and did not return. The appellants claim that they re-entered and re-possessed themselves of the premises on the 23d day of April, 1912. They harvested the crop in July following. Upon the other side of the case, the respondent Maxwell testified that the respondents bought Meyers' interest in the growing crop upon one hundred and fifty

acres of the leased premises, on the 24th day of February,
1912; that they paid $2.95 per acre and gave a note for the
purchase price; that they harrowed all of the wheat the latter
part of March; that the respondents again went upon the
land about the 20th day of April; that the respondent Max-
well then told the appellants that they "had bought Charley
Meyers' wheat, and they said, Yes;" that "we talked about
the crop and I asked them [the appellants] if they thought
that winter wheat up there would make anything, and that
Abe [meaning the appellant A. R. Dimond] says, 'Well, it
didn't look like there is anything there; pretty thin.' So we
went on up and left there [meaning the barn where the con-
versation occurred] and went up on the wheat and put out
the poisoned wheat." He further testified that he told the
appellants that he had harrowed the wheat. He further
testified that the respondents were next there about May
20; that they harrowed between fifty and sixty acres of the
wheat at that time; that the harrows pulled out some of the
wheat, so that they concluded that it would be best to dis-
continue the harrowing at that time; that he then had a con-
versation with Hugh Dimond in which he (Maxwell) told
Dimond that he believed he would quit harrowing because the
harrows were pulling out the wheat, and that Dimond said,
" 'If it has got a good mulch on it, it does not need any har-
rowing any more.' So I told him it had, and so we quit har-
rowing and went home." The witness said that respondents
were next there about the 23d day of May; that they put
squirrel poison over the entire tract and pulled some weeds
and fixed a little fence; that the appellants then called them
down to their house, which was near by, and for the first time
asserted ownership to all the wheat, and said to them that they
intended to hold it. This information was given by the appel-
lants, the respondents say, immediately after a heavy rain.
The wheat was then heading and, according to the testimony
of one of the respondents, its condition was such that it was

"bound to be a bumper crop." At this stage of the case the court, upon motion of the appellants' counsel, struck the evidence as to the harrowing done in March. After this testimony was stricken, the appellants' counsel, upon the cross-examination of a witness, developed the fact that the respondents had harrowed the entire crop during the month of March. This fact was shown later by the testimony of one of the respondents which was not stricken. One of the respondents testified that, at the time they harrowed the fifty or sixty acres of wheat, and at the time they put out the squirrel poison, the appellants were upon the adjoining tract, and that "I could not say that they saw me, no. They could not very well help it." At the time this harrowing was done the appellants were living in a house about a quarter of a mile distant from the land upon which the respondents were working, and were working upon adjoining land. The topography of the country was such that we think the jury was warranted in drawing the inference that the appellants did see the respondents at the time they were harrowing, putting out poison, pulling weeds, and fixing the fence.

At the close of the respondents' testimony, the appellants' challenge to the sufficiency of the evidence was denied. The appellant A. R. Dimond testified that the auctioneer told him the latter part of March that he had sold the wheat; that he told him "I guessed he was mistaken . . . that there was a lease; that the lease said that it could not be assigned nor disposed of without written consent." The appellants in the main denied the conversations to which the respondents testified.

Upon these facts, we think the court was warranted in denying the appellants' challenge and submitting the case to the jury. *Rowe v. James,* 71 Wash. 267, 128 Pac. 539; *Carruthers v. Whitney,* 56 Wash. 327, 105 Pac. 831, 134 Am. St. 1114.

In *Rowe v. James,* we said:

"The basis of all estoppel *in pais* is that there is one innocent party and one negligent or wrongdoing party, and the doctrine means that, when the innocent party has been induced to surrender a valuable right or to change his position to his prejudice relying upon the acts or representations of the negligent or wrongdoing party, then the latter will not be heard to assert the falsity of his acts or representations to the prejudice of the former."

In *Carruthers v. Whitney,* Judge Dunbar, speaking for the court, said:

"The well-understood idea of equitable estoppel is that, where a person wrongfully or negligently by his acts or representations causes another who has a right to rely upon such acts or representations to change his condition for the worse, the party making such representations shall not be allowed to plead their falsity for his own advantage."

The testimony as to the harrowing done in March was admissible upon two grounds, (a) to show that the respondents were acting in good faith, and (b) because of the testimony of the respondent Maxwell to the effect that he told the appellants in the first conversation he had with them that he had harrowed the wheat. The jury evidently believed this testimony. When silence becomes a fraud, it will operate as an estoppel. When the appellants found that the respondents had bought Meyers' interest in the crop and had harrowed the wheat and were intending to again harrow it and do whatever was necessary to contribute to its proper growth and maturity, it became their bounden duty to speak, and their silence, in the face of the facts stated, was of such a character as to warrant the jury in inferring ratification or estoppel. It was upon this theory that the court submitted the case to the jury. He instructed the jury that, under the terms of the lease, Meyers had no right to sell his interest in the growing crop; that if he did sell it and left the leased land without any intention of returning, the attempted sale and departure from the land operated as an abandonment

of the lease; that the respondents acquired no rights from the mere fact of purchase "unless the attempted sale was subsequently ratified or acquiesced in by the Dimonds or unless their subsequent words, acts, or conduct were such as to legally estop them from now claiming that they did not ratify or acquiesce in such attempted sale." The court further instructed the jury that, if they should find from the evidence that the respondents bought Meyers' interest in the growing crop and paid a valuable consideration therefor and thereafter claimed it as their own, and these facts came to the knowledge of the appellants, and they by their conversation or conduct led the respondents to believe that they consented to the sale or ratified it, and that relying on such belief, the respondents thereafter expended work and labor upon the crop, their verdict should be for the respondents, for the sum which the parties had stipulated was the net value of the wheat.

No error is assigned to the instructions, and we think the evidence warranted the verdict. The judgment is affirmed.

CROW, C. J., MORRIS, PARKER, and CHADWICK, JJ., concur.